Littleton, Judge (Ret.),
delivered the opinion of the court:
This case is before the court pursuant to Senate Eesolution No. 252, of May 9, 1956, which provides that the court report to the Senate on the legal or equitable merits of the plaintiff’s claim to recover for losses incurred by it in a transaction with the United States.
The plaintiff’s claim is, in substance, that the United States made a contract with the plaintiff under which the plaintiff was to grow, from seed purchased from the Government, a jute-like crop named kenaf, and the Government was to purchase from the plaintiff, at a stated price per pound, the seed produced from the crop; that, because of a plant disease which infected the crop, the yield of seed was so small that plaintiff suffered a heavy loss in the transaction; that the Government knew or had reason to know, at the time it made *534 its contract with the plaintiff, that kenaf was susceptible to the disease and did not disclose that information to plaintiff, and thereby induced plaintiff to enter into the contract, which resulted in the loss.
We assume that if the United States, in order to obtain a quantity of seed which it desired for the production on American soil of a needed crop of a kind not hitherto grown in this country, made a contract for the growing of such a seed crop, and did not disclose to the other party pertinent information, which it possessed, to the effect that the growing of such a crop was subject to the perils of a plant disease which might well destroy the crop, and if, in fact, the disease did infect the crop and cause the other party to the contract to suffer loss, the United States would be, at least morally, and on the basis of fair dealing, obligated to compensate the other contracting party for its loss.
The instant case does not, however, present the situation which we have assumed. The contract between the plaintiff and defendant was made on July 6,1951. It is important to determine what the United States knew, or had reason to know, at that time, of the disease which, later in 1951, damaged plaintiff’s crop.
In August of 1950, Harold D. Lynn, a research specialist in the United States Department of Agriculture, had grown an experimental crop of kenaf in Cuba. He was using strains from 36 different countries in an attempt to learn which was the most desirable strain. His crop was a good one. An abnormality, in the form of a discoloration of leaves, appeared, but only in less than one percent of the crop. In December of 1950, Lynn planted another crop of kenaf in Cuba, and no signs of the previous abnormality affected this crop. Lynn was not a plant pathologist, an expert in plant diseases.
As stated above, kenaf was a substitute for hemp or jute. Because of the hostilities in Korea, the United States did not want to continue to be dependent upon India and Pakistan for jute. To grow the substitute, kenaf, in this country, a large supply of kenaf seed had to be acquired. A great deal of seed was produced in Cuba, but competition for the purchase of it by concerns from all over the world depleted the *535 supply and increased the price inordinately. The Government desired to have seed produced by growers under contract to sell their seed to the Government at a price agreed upon in advance. The proposed project was to be in charge of Commodity Credit Corporation, (CCC), an agency of the United States.
Plaintiff, on March 28, 1951, before the Government had announced or even developed its proposed program, sent a letter to CCC stating that it was producing hard fibers elsewhere in the world and had available technicians, and knowledge of the production of these fibers; that if CCC was considering the production of kenaf under contract, plaintiff would be interested in discussing the subject. The Government’s reply to this letter said that no definite decision as to whether there would be a Government-sponsored program for the production of kenaf had been reached. The writer of the reply stated that he would be glad to discuss kenaf production with representatives of the plaintiff. On April 10 by telephone and by letter of April 11, plaintiff expressed its desire to be considered if there should be a program for the production of kenaf.
Sometime before May 1,1951 identical telegrams were sent to plaintiff and seven others, advising that a meeting would be held May 1 at the Everglades Experiment Station in Florida, to discuss domestic kenaf production. The telegrams were sent by E. D. Bell of the United States Department of Agriculture. The meeting took place. It was presided over by a Mr. Blank, manager of the Palm Beach Development Company, a Chamber of Commerce type organization. Some 35 people were at the meeting. Bell explained the reason for the Government’s need of kenaf seed, and informed the group that the Government wanted to ascertain how much of such seed could be produced in Florida in 1951 if the growers would get a guaranteed price of from 60 to 90 cents, probably about 15 cents, per pound. Inquiry was made as to whether the Government would finance the production and Bell stated that it would not. A representative of the only grower in attendance which had produced kenaf in Florida, one crop duringthe 1949-50 growing season, at Vero Beach, spoke concerning expected yields. Plaintiff’s *536 representative at the meeting also spoke and stated that his company produced many agricultural products such as tobacco, rubber, palm oil and ramie and thought it worthwhile to be represented at a meeting where such an important new crop as kenaf was being discussed.
On May 25, 1951, plaintiff wrote the Government that it planned to grow at least 500 acres of kenaf for seed in Florida subject only to its ability to obtain suitable land, which it would promptly attempt to obtain. It requested information as to when a contract for seed production would be available. July 2, plaintiff advised the CCC that it had obtained 450 acres of land on which it would grow kenaf seed. June 25 the CCC issued, and July 27 published in the Federal Register its notice on the kenaf program for the 1951 crop. July 6,1951 plaintiff and CCC entered into a contract by the terms of which CCC agreed to sell 9000 pounds of kenaf seed at 98.5 cents per pound to plaintiff, and plaintiff agreed to plant the seed on approximately 450 acres of land in Florida. CCC agreed to purchase the seed produced from plaintiff’s planting, if it was of a specified quality, up to a maximum of 135,000 pounds, and CCC was to have an option to purchase any excess over that amount. The price to be paid by CCC was to be 75 cents per pound, with a slight discount for seed slightly varying from the stipulated quality.
Plaintiff planted 9126 pounds of seed obtained by the CCC in Cuba, on five different tracts totaling 425 acres in Florida. The planting began on July 21.
October 23 plaintiff inquired whether the Government intended to exercise its option to purchase that part of the plaintiff’s crop of seed which would exceed 135,000 pounds. November 20 plaintiff was advised that the Government would exercise the option. After an excellent early growth, almost immediately after the first bloom appeared on the crop on one of plaintiff’s tracts, the county agricultural agent observed an unidentified disease on the crop in two widely separated spots in the field. By November 15 the effect of the disease on the crop was so serious that plaintiff’s local manager requested plaintiff’s research director to come to Florida. The research director took samples of diseased *537 plants to the United States Department of Agriculture’s research center at Beltsville, Maryland.
November 27, 1951, Dr. Presley, Plant Pathologist at the Beltsville center reported the center’s tentative findings to plaintiff’s research director. Additional specimens of the diseased plants were sent by plaintiff to Beltsville. That station’s findings were that the disease was anthracnose, the scientific name of which is Golletotrichum, hibisci. This disease is often found in Florida on cotton, and okra, which, like kenaf, are members of the hibiscus family.
As a result of the anthracnose and other diseases, plaintiff’s crop was largely a failure; 191.31 acres of its plantings were abandoned as not worth the cost of harvesting; the yields from the harvested acres varied, but were, in general, far below the anticipated yields; only 36,908.5 pounds of seed were harvested from all plaintiff’s plantings, and plaintiff lost heavily on its kenaf project.
In a report published by the Department of Agriculture on November 24, 1951, after the disastrous developments in Florida, comment was made on the observation by Mr. Lynn in Cuba in August of 1950 of tip-streaked kenaf. The report stated that the same condition had been found in 2310 of 9595 acres of kenaf growing in Cuba in November 1951, and that the disease was 0olletotrichum hibisci.
As hereinbefore stated, the plaintiff claims that the Government, when it contracted with plaintiff in July 1951 for the growing of kenaf, withheld information which, at least in good morals, it should have given plaintiff, so that plaintiff could have considered that information in making up its mind whether to engage in the kenaf proj ect. Our summary of the history of the transaction shows that plaintiff’s claim is not well founded. The Government had, in July of 1951, no information which was of any significance with regard to the problem which later developed. Assuming that what Mr. Lynn in Cuba knew, the Government knew, its knowledge was that in an insignificant portion of a kenaf experimental planting, a discoloration at the tip of the leaves had occurred. It did not know that these plants were afflicted with Col-letotrichum hibisci or any other potentially ruinous disease. *538 It knew that in a later planting in Cuba in 1950 no such discoloration occurred at the tips of the leaves.
If the Government’s agents who made the contract with plaintiff had in fact known of Lynn’s Cuba observations, it is not conceivable that either they or plaintiff’s representatives would have regarded those observations as significant. Plaintiff was no amateur. It was a large planter with varied experience in many countries. Like every planter, it was accustomed to taking the risks of weather, insect pests and plant diseases. It would not have been frightened away from an important piece of business by the appearance, in another year and another country, of some discoloration in the leaves of an insignificant portion of a crop.
The plaintiff has no legal or equitable claim against the United States, and the court so reports to the Senate of the United States in this opinion, and the findings of fact accompanying it, which will be certified to Congress pursuant to Senate Eesolution 252,84th Congress, 2d session.
Laramore, Judge; Whitaker, Judge, and Joistes, Chief Judge, concur.
EINDINGS OF FACT
The court having considered the evidence, the report of the Trial Commissioner William E. Day, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff is a corporation organized and existing under the laws of the State of Connecticut and having its principal place of business in Hartford.
2. This action was filed pursuant to Eesolution 252 of the Senate of the United States, of May 9,1956. The resolution referred a House bill and provided that this court report findings of fact and conclusions as shall be sufficient to inform the Congress of the nature and character of the demand of the plaintiff as a legal or equitable claim and the amount, if any, legally or equitably due the plaintiff from the United States.
3. In late 1950 discussions were had between certain representatives of the Office of Foreign Agricultural Eelations of the United States Department of Agriculture, a representative of the Department of Defense, and Mr. E. D. Bell, *539 Deputy Director of the Cotton Branch of the Department of Agriculture, concerning the fact that the limited supply of kenaf seed in this hemisphere, which for the most part was located in Cuba, was being depleted by purchases made by concerns throughout the world.
It appeared that fiber from kenaf would be a suitable substitute for jute. For this reason it was believed that some steps should be taken to keep the remaining kenaf seed in Cuba within this hemisphere, and that a program should be undertaken to have a substantial seed stock developed from it in view of the military operations in Korea, with the possibility of having shipments of jute from India and Pakistan stopped.
The Department of Defense thereafter requested the Department of Agriculture to undertake the production for stockpiling of a quantity of kenaf seed and to experiment with kenaf fiber extraction, with the Department of Defense underwriting the cost incurred by the Department of Agriculture.
4. On March 28,1951, Imperial Commodities Corporation, an affiliate of the plaintiff company, sent a letter to the Commodity Credit Corporation (hereinafter called CCC) stating that that firm was producing hard fibers elsewhere in the world and had available technicians and knowledge of the production of these fibers. The letter further stated that if the CCC was considering the production of kenaf by contract they (meaning Imperial) would be interested in talking with them about it when convenient. The letter was signed on behalf of Imperial by Mr. Charles D. Lewis.
5, On April 4, 1951, the above letter was acknowledged by Mr. E. D. Bell, Deputy Director, Cotton Branch, Commodity Stabilization Service, United States Department of Agriculture. In it Mr. Bell stated that there had been some exploratory discussions of the possibility of a kenaf production program to be sponsored by the Government but as of that time no definite decision had been reached. He indicated that he would be glad to discuss kenaf production with Mr. Lewis, or a representative of his firm at any time either would be in Washington.
*540 6. On April 10, 1951, Mr. Lewis telephoned Mr. Bell further inquiring concerning the kenaf program, and confirmed the telephone discussion by letter the next day as follows:
This will confirm my telephone conversation with you yesterday regarding the production and processing of kenaf.
It is my understanding that if and when the Dept, decides to call upon growers and processors to contract for the production and processing of this material, including the production of seed, we can look forward to hearing from you in order that we may have an opportunity to offer our services along with other qualified producers and processors of hard fibers.
7. Some time before May 1, 1951 the following telegram was sent to eight addressees, including Charles D. Lewis, Imperial Commodities Corporation, and the Florida Agricultural Council:
MEETING TO DISCUSS DOMESTIC KENAF PRODUCTION BEING HELD AT THE EVERGLADES EXPERIMENT STATION, BELLE GLADE, FLORIDA, MAY 1,10 A. M. IF YOU DESIRE YOU MAY ATTEND OR SEND REPRESENTATIVE.
E. D. BELL DEPUTY DIRECTOR
8. The Everglades Experiment Station, Belle Glade, Florida is operated by the University of Florida, a state-owned institution. Dr. Robert D. Allison was in 1951 in charge of that station.
9. On May 1, 1951 a meeting was held at Everglades Experiment Station. There is in evidence a report on that meeting prepared by Mr. Garrett Krot, Assistant to the General Manager of the plaintiff company. The meeting was called to order by and was presided over by Mr. R. J. Blank, Manager of the Palm Beach Development Company. About 35 people attended. Mr. Blank introduced Mr. E. D. Bell of the Cotton Branch, Production and Marketing Administration of the Department of Agriculture, and Mr. Dennis of CCC. Bell explained that the defense author *541 ities were anxious to bave sufficient kenaf seed stock to grow in the United States or the Western Hemisphere in case the United States should be cut off from its supply of jute. Bell stated that the Department of Agriculture wanted to know how much kenaf seed could be produced in Florida in 1951 if the growers got a guaranteed price of 60-90 cents per pound, probably about 75 cents per pound. The goal was stated by him to be 2,300 tons of seed for stockpiling. He said that all available seed was in the hands of Cuban growers, and that the demand for that seed was so great that within a year the price had increased from 18 cents to one dollar per pound. He further observed that it would be necessary to obtain such seed in competition with the Philippines, India, Pakistan and China. Inquiry was made concerning the extent to which the Government would assist in financing the project. Bell answered that the Government would not furnish such assistance. A Mr. E. G. Henriquez of Tropical Fibers, Inc. spoke concerning expected yields. He was the only person in attendance who had grown kenaf in Florida. He had had earlier experience in growing kenaf in Cuba beginning in 1947 or 1948, and had grown one crop at Yero Beach, Florida during the 1949-1950 growing season.
A large scale producer of kenaf in Cuba was Kenaf Fiber Corporation of America. A Mr. Adams of that firm spoke of its Cuban production and said that his firm would gladly take over the entire program, and in addition would teach the Florida growers how to grow kenaf.
Mr. Dennis of CCC stated that the meeting was being held to see what could be done within the continental United States and only after that possibility had been exhausted would the program be extended beyond its limits.
Mr. Blank called upon Mr. Krot of the plaintiff company who said that his firm grew and produced many agricultural products such as tobacco, rubber, palm oil and ramie, and that his company thought it very worthwhile to send someone to a meeting where such an important new crop as kena.f was being discussed.
10. On May 25, 1951, Imperial Agricultural Corporation, by Mr. Lewis, wrote to Dr. Allison, Director of the Ever *542 glades Experiment Station, Belle Glade, Florida advising that that firm proposed to grow at least 500 acres of kenaf for seed in 1951 provided it could locate suitable land. It requested a conference concerning the services of a well trained technician to advise where it should seek the land and specific advice concerning particular fields when they might be acquired.
11. On the same day, May 25,1951, Imperial Agricultural Corporation, by Charles D. Lewis, wrote to E. D. Bell, Deputy Director, Cotton Branch, Production and Marketing Administration, Department of Agriculture, advising that that firm planned to grow at least 500 acres of kenaf for seed in Florida subject only to its ability to obtain suitable land, and that prompt efforts to obtain it would be undertaken. Inquiry was made as to when the contract for domestic seed production would be available.
12. On July 2, 1951 the plaintiff wrote to CCC advising it that it had obtained 450 acres of land on which it would grow kenaf seed. This letter referred to a letter of June 21 from the plaintiff to CCC, which was not offered in evidence.
13. On June 25,1951, the CCC issued, and on July 27,1951 published in the Federal Register, its notice on the kenaf program for the 1951 crop. The plaintiff already had obtained more information about the program than was contained in such notice in view of the discussions had and letters exchanged prior to that time.
14. On July 6,1951, the plaintiff, by Charles D. Lewis, and the CCC, by C. D. Walker as contracting officer, entered into a contract by the terms of which CCC agreed to sell 9,000 pounds of kenaf seed at 98.5 cents per pound to the plaintiff which agreed to plant approximately 450 acres of land in Florida. The CCC was to purchase the entire quantity of seed of a stated quality produced up to a maximum of 135,000 pounds with an option to purchase the excess. The price of the seed to be purchased by CCC was 75 cents per pound for seed of a certain quality, discounted slightly for seed of lesser quality. The contract as amended provides in part as follows:
The kenaf seed purchased by Contractor shall be delivered f. o. b. warehouseman’s loading platform at ware *543 houses designated by CCC in the State of Florida. Such seed has been purchased by CCC on the representation that it is of a germination not less than 70 percent, purity not less than 97 percent and moisture content not in excess of 16 percent. Contractor may, at his expense, cause such seed to be tested prior to removal from the warehouse and may reject such seed if it is not of the quality stated above. CCC shall not be liable for • the quality of such seed except to the extent and in the manner herein stated.
5. Inspection
Contractor shall arrange to permit representatives of CCC at all reasonable tunes to observe the lands on which the kenaf seed purchased from CCC has been planted, the method of cultivation and harvest, and the methods used in preparing the crop for delivery to CCC.
9126 pounds of kenaf seed which CCC obtained in Cuba was sold and delivered to the plaintiff by CCC and later planted by the plaintiff.
15. Contracts similar to the plaintiff’s contract were entered into between CCC and other growers. There were six contractors in Florida and two in Cuba.
16. Pursuant to the contract plaintiff planted a total of 425 acres at the following locations:
Plantation I 185 acres near Fort Lauderdale
Plantation II 21 acres near Fort Lauderdale
Arrow Farms 83 acres near Indiantown
68 acres near Indiantown
Hobe Sound 68 acres near Hobe Sound
17. The plaintiff assigned a Mr. York in charge of its operations in the kenaf program in its early stages. Planting first began at Fort Lauderdale on July 21,1951. Within a few weeks the plaintiff assigned Mr. Charles M. Baker to the program and he soon replaced Mr. York as manager. Apparently, York had prepared the soil at the various locations upon the recommendation of the Everglades Experiment Station at Belle Glade.
18. Although the plaintiff contends that in the selection of the acreage, the details of planting the seed and the cultivation of the ensuing crop, it was constantly and consistently advised and guided by scientific employees of the Federal Government, it is found as a fact that this is not true.
*544 19. On September 17, 1951 the plaintiff sent a letter to the contracting officer as follows:
We hereby advise you that the planting of the kenaf seed, under our above mentioned contract, has now been completed.
We were advised by Mr. Charles Ingram that a representative of the Commodity Credit Corporation will be in Florida sometime late September or early October to make an inspection and approve the execution of the program so far. We would appreciate being advised, if convenient, when your representative intends to make this inspection.
20. The plaintiff was advised by return mail by Mr. Bell that Mr. Charles Ingram of the Cotton Branch, CCC, would be in southern Florida for several days beginning September 26 for the purpose of inspecting kenaf plantings made by the producers who had contracts with CCC, and that Ingram would include plaintiff’s farm or farms among those he would visit.
21. On October 23, 1951 the plaintiff sent the following letter to the contracting officer :
With reference to Paragraph 3A of the above contract would it be possible for you to give us some indication now as to whether you intend to exercise your option to purchase the production of kenaf seed in excess of the stated maximum 135,000 pounds.
Beferring to the inspection by Mr. Chas. D. Ingram, we wonder whether it is your intention to issue to contractors some statement indicating approval of the execution of the contract up-to-date. We would like to add that it would be most helpful if some advice from your side could be obtained on this point.
22. On September 26 and 27 Mr. Ingram did visit the plaintiff’s plantings. On November 20 the plaintiff was advised that “insofar as could be determined all terms of the contract had been complied with up to that date.” This was in a letter from the contracting officer, who said also that the option referred to would be exercised by CCC.
23. The yield of seed from the various farms is shown below:

*545

As seen from the above, 191.31 acres were abandoned as the cost of harvest was substantially more than the return which could be gained by the sale of harvested seed to 000.
24. The planting at Plantation I came up to a good stand but around September 1 root knot nematodes appeared. About three weeks later fusariam wilt attacked the crop and it began to show signs of dying. Army worms attacked the crop and it was dusted by airplane with DDT dust.
At Arrow Farms the planting came to a good stand until an eight inch rainfall about August 24. It rained intermittently almost each day for two weeks and the fertilizer was washed from the soil. A top dressing of fertilizer was applied and further rain washed some of it away. Dusting of the crop was performed on four separate days between November 3 and November 13 to combat powdery mildew and aphid.
The crop at Leighton, which proved to be most productive of any of the plaintiff’s plantings, was controlled by periodic dusting for powdery mildew, army worms and insects.
Planting at Hobe Sound was completed about August 19. Growth of the crop during its early period was excellent. The first bloom appeared October 12, 1951. Shortly after this the county agricultural agent observed an unindentified disease on the crop in two widely separated spots in the field. This agent took samples of the diseased plants to the Everglades Experiment Station at Belle Glade to learn the identity of the disease. By November 15 the effect of the disease on the crop was such that Mr. Baker, the plaintiff’s manager, requested Dr. Wijga, plaintiff’s research director, to come to Florida to observe the crop. Wijga took samples *546 of diseased plants to the Department of Agriculture research center at Beltsville, Maryland.
25. On November '27, 1951, Dr. John T. Presley, Plant Pathologist at the Beltsville, Maryland research center, sent the following letter to Dr. Wijga:
The cultures obtained from the diseased kenaf plants which you brought from Florida have fruited and we have tentatively identified them as follows:
Stem and pith of plant with vascular discoloration yielded Fusarium.
Lesions on the steins yielded Colletotrichum and Fu-sarium.
Dead and dying flowers and flower-buds yielded Col-letotrichum.
Dead terminal portion of plants yielded Colletotri-chum.
Diseased leaves yielded Curvularia, Alternarla, As-pergillus, Penicillium and Colletotrichum.
A_ Fusarium was isolated consistently from the plant with vascular discoloration and apparently was the cause of the discoloration and wilt of the plant. The lesions on the stems of the plants yielded both Fusarium and Colletotrichum, but it is my belief that the Fu-sarium was secondary and that Colletotrichum was the primary invader, probably following insect or mechanical injury. The flowers appear to be primarily affected by Colletotrichum. The leaves, as would be expected, yielded cultures of the common airborne fungi as well as Colletotrichum.
From the results of these cultural trials it is our opinion that kenaf is quite susceptible to Colletotrichum (An-thracnose) and that with myriads of insects present in the plantings, ample opportunity for infection of the leaf and stem is afforded. The flowers and flower buds of course are easily infected by insect-borne or rain-splashed spores of the anthracnose fungus.
No recommendations can be made until we have more information at hand, but it would appear that an insecticide alternating with a fungicide might prove beneficial. There probably are several insecticide-fungicide dusts which are compatible and which would be effective if applied simultaneously.
We enjoyed your visit and trust that we shall have opportunity to discuss with you other problems of kenaf culture which may arise.
*547 26. Thereafter Mr. Baker, plaintiff’s manager, sent further specimens of diseased kenaf to the Beltsville research center and on December 14, 1951 he was advised by letter in part as follows:
John A. Stevenson, Mycologist of this Bureau has made the following statement in regard to the material you sent in.
“I have examined the Kenaf specimens which Mr. Baker sent you from Palm Beach, Florida. I find the common anthracnose fungus abundantly present on diseased tips and in comiection with stem cankers the fungus often grows from these cankers up along the pedicels and in some instances even into the capsules themselves. On some of the stem lesions there is also a trace of other fungi such as PeStilotia. I assume that these latter organisms are secondary.”
According to this identification and examination, there is no evidence of an additional disease. In looking for a new disease we are never disappointed in failure. I hope the characteristics that you found here are merely another symptom of the disease that has been noted previously.
27. Anthracnose is apparently the common name for Gol-letotrioh,um hibisci. According to the county agricultural agent it is often found in Florida on okra and cotton which like kenaf are members of the hibiscus family.
28. As shown in finding 23, the plaintiff harvested about 234 acres of the 425 acres which it had planted. 36,908% pounds of seed were realized. The defendant paid to the plaintiff the sum of $27,681.38 at the rate of 75 cents per pound.
29. The plaintiff shows a cost of $86,076.06 not including costs of administration as to which its proof was not satisfactory. The plaintiff’s net loss on this venture was $58,394.68.
30. The plaintiff demonstrated good agricultural practice in its operations under the kenaf program. According to Dr. Allison, however, the plaintiff along with other growers experienced this crop failure principally because of anthrac-nose or Oolletotriohwm Mbisoi. On the basis of the entire record, it is so found.
31. In August 1950, Harold D. Lynn was employed in Cuba as a research specialist in the office of Foreign Agri *548 cultural Relations which has been described as the Foreign Division of the United States Department of Agriculture. In his work with the Cooperative Fiber Commission (a joint effort between the United States and Cuba), he was engaged as a plant breeder in developing more suitable strains of kenaf than were then available for commercial plantings. He was working with seed from 36 countries of the world. In August of 1950, Lynn observed that some of his experimental plantings showed an abnormality in that the tips of the plants failed to continue to grow. He did not recognize this as a disease. He was not a plant pathologist.
The abnormality that appeared in Lynn’s experimental crop of kenaf in August 1950 affected less than one percent of the planting. The experimental crop as a whole was considered to be a good stand of kenaf. Due to the great number of different strains that he was handling, Lynn considered that the abnormality was primarily a genetic problem. In December of 1950, approximately six months before plaintiff was awarded its contract, Lynn planted another crop for seed and there was no evidence of abnormality in that crop.
Lynn in his experimental plantings had made such plantings for both fiber crops and seed crops. With regard to the plantings for seed crops, he had 3,000 selections which he referred to in his testimony as 3,000 plants in 30-foot rows. The seed which he planted had come from 36 different countries of the world, planted in an unfamiliar environment, including material of hybrid types. Lynn did not recognize the abnormality as a disease, however, since he was a plant geneticist. He knew something was wrong in the development of the plants but did not know what it was. Less than one percent of the 3,000 plants were affected with the condition which was later determined by others to be Gol-letotriohmn hibisci.
In 1950, Lynn had also observed commercial plantings in Cuba, but did not observe any diseases on such plantings.
32. In a report published on November 24,1951, Dr. Frederick L. Wellman commented upon apparent virus tip-streaked kenaf in Cuba, and referred to the observation of that condition by Harold Lynn in Cuba in August of 1950 *549 in Ms plant breeding plots. It seems clear now that what Lynn saw then has been definitely identified as Oolletotri-churn Mbisci. Wellman reported further that it had been found in 2310 acres of 9595 acres of kenaf growing in Cuba in November 1951.
33. The plaintiff’s position appears to be that since Lynn saw a condition on kenaf in Cuba in August 1950, the Government had information which the plaintiff did not have when it entered into the seed program in 1951.
34. On March 28, 1952 the Plant Industry Station of the Beltsville research center, through Drs. John T. Presley and Elton G. Nelson, issued the following report on kenaf diseases:
The disease problem on kenaf in the United States follows the usual pattern of diseases occurring in damaging proportions where the production of a new crop is concentrated in new areas. During the time when kenaf was planted only in small isolated plots, there was no record of a serious disease outbreak. In 1951, however, there was a considerable increase in the acreage planted to kenaf and several diseases were noted. The technical personnel at Belle Glade, Florida have prepared preliminary reports on the disease situation. These reports will soon be published.
Among the diseases observed on kenaf were several diseases of minor importance such as the leaf spots, fu-sarium wilt, rMzoctonia root rot and charcoal root rot. Boot-knot nematodes were also found to be seriously affecting the crops in certain areas. Many of the plants were killed outright and others severely stunted. Seed production was reduced in some areas to the extent that harvesting was not practical.
An unusual disease appeared in epidemic proportions over wide-spread areas and caused serious damage to the crop. The disease in question produced a witches-broom effect on the plant and has been supposed by some workers to be caused by a virus. The exact nature of the malady has not as yet been determined, but it has been referred to as “asparagus tip,” “virus streak,” and “virus-like” disease. It is by far the most destructive of the diseases recognized to date. There is a striking similarity between this disease and the “ramulose” disease of cotton, as described in Brazil. The cotton disease was at first considered to be caused by a virus, but subsequent experiments proved it to be caused by a fungus G'olletotrichwn. The similarity of the two dis *550 eases has led some investigators to believe that a Gol-letotricTwm may be involved in the kenaf disorder. This view of the problem is supported by the fact that Oqlletotriclvwm spores are commonly found associated with affected plant parts of kenaf and the fungus is readily isolated in the laboratory. Investigations are underway to determine the exact nature of the disease and also to study its relation to cotton or other closely related crop plants normally produced in the areas where kenaf may be grown. This information will be made available as definite results are obtained.
Since other species of CólletotricKvm are known to be seedbome, it would appear that growers should be cautioned to treat the kenaf seed with an effective seed pro-tectant a few days prior to planting.
35. On April 2,1952, the plaintiff sent a letter to the president of the CCC in which it claimed reimbursement of its costs in growing, harvesting and delivering the 1951 kenaf seed crop. It took the position that the crop failure was caused by diseased seed furnished it by the CCC.
36. On May 29, 1952, the president of the CCC rejected plaintiff’s claim.
37. The United States, in its dealing with plaintiff, did not withhold significant information which it had or should have had.